# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

FEENEY BROTHERS EXCAVATION )
TRUST, AM FEENEY CORP, )
FALMOUTH 2011 IRREVOCABLE )
TRUST, and DENNIS 2011 )
IRREVOCABLE TRUST, )
                                         )
        Plaintiffs, )
                                           )
        v. )  C.A. No. 2025-0558-PAW
                                           )
ARTERA SERVICES HOLDCO, LLC, )
ARTERA SERVICES, LLC, ARTERA )
SERVICES MANAGEMENT )
FEEDER, LLC, and CLAYTON )
DUBILIER & RICE, LLC, )
                                           )
        Defendants. )

Submitted: April 10, 2026
Decided: July 31, 2026
Revised: August 7, 2026

## MEMORANDUM OPINION

*Upon Defendants' Motion to Dismiss the Amended Verified Complaint;*
**GRANTED.**

Thomas A. Uebler, Esq.; and Adam J. Waskie, Esq., of McCollom D'Emilio Smith Uebler LLC; Benjamin J. Wish, Esq.; Evan A. Johnson, Esq.; and Maria T. Davis, Esq., of Todd & Weld LLP, *Attorneys for Plaintiffs*.

Raymond J. DiCamillo, Esq.; and Austin R. Niggebrugge, Esq., of Richards, Layton & Finger, P.A.; Maeve O'Connor, Esq.; and Zachary H. Saltzman, Esq., of Debevoise & Plimpton LLP, *Attorneys for Defendants*.

**WINSTON, J.[1]**

---

[1] Sitting as a Vice Chancellor of the Court of Chancery by designation of the Chief Justice pursuant to *In re: Designation of Actions Filed Pursuant to 8 Del. C. § 111* (Del. Feb. 7,

## I.    <u>INTRODUCTION</u>

Plaintiffs sold their business to defendants.  In return, plaintiffs received both monetary consideration and "rollover" equity in a defendant business.  Plaintiffs now assert that the rollover equity was not worth as much as they were led to believe.  Plaintiffs seek to recover under theories that are both intra- and extra-contractual.  None of those theories succeed.

Plaintiffs' intra-contractual theories seek representations and warranties or a guaranty of the rollover equity's intrinsic value.  But there are no such representations or guaranties in the contract.  Plaintiffs' breach of contract claim is based on recital definitions, which cannot impose obligations.  Their intra-contractual fraud claim is not tied to any intra-contractual representation or warranty.  And their implied covenant claim does not plead an implied duty that defendants plausibly breached.

Plaintiffs' extra-contractual fraud claim fails because the contract contains a valid disclaimer of reliance on extra-contractual representations.  In the anti-reliance clause, the plaintiff "Investor" affirmatively represents that there are no representations or warranties other than those contained in a particular section of the

---

2025), most recently extended in the Sixth Amended Cross-Designation Order dated May 21, 2026.

written agreement. A buyer may not rely on extra-contractual representations that it agreed do not exist.

For these reasons, and as explained further below, Plaintiffs' complaint is dismissed.

## II. FACTUAL AND PROCEDURAL BACKGROUND[2]

### A. THE TRANSACTIONS AT ISSUE, GENERALLY

Brendan and Aidan Feeney (the "Feeneys") formed Feeney Utility Services Holdco, LLC ("FUSH"), which held significant portions of the Feeneys' utility construction business.[3]

In 2021, the Feeneys, through certain entities, sold their FUSH equity to one of defendants.[4] The sale was effected through an Equity Purchase Agreement, which states that it was made as of May 18, 2021 (the "EPA").[5] In addition to receiving

---

[2] The facts are drawn from the complaint and the documents incorporated therein. The Court accepts as true the well-pled facts in the complaint solely for purposes of defendants' motion to dismiss. Unless otherwise specified, references to the "complaint" herein refer to the operative Amended Verified Complaint. D.I. 17 (hereinafter "Compl."). The Court has not considered Exhibit 1 attached to defendants' opening brief, *see* D.I. 22, because it is unnecessary to the Court's decision.

[3] Compl. ¶¶ 19, 21-22.

[4] *See id.* ¶¶ 1, 63; Compl. Ex. A (hereinafter "EPA") at 1-2, § 1.01(a). In addition to the Feeneys, non-parties CAI Capital Partners and DDS Companies, Inc. (through certain entities) also sold their interests in FUSH. *See* Compl. ¶¶ 23-24, 26; EPA 1-2, § 1.01(a). However, the fact that there were additional sellers is not material to the issues presented in the present motion. Accordingly, even where the complaint references these additional sellers, this opinion generally refers only to the Feeneys or the plaintiffs in this action.

[5] *See* Compl. ¶ 1; EPA at 1.

monetary consideration, the Feeneys received "rollover" equity in one of defendants.[6] The rollover equity was issued pursuant to a Rollover Agreement, dated as of May 18, 2021 (the "Rollover Agreement").[7]

This action primarily concerns the value of the rollover equity. The parties, the events leading up to the EPA and Rollover Agreement, and those agreements' terms, are described in further detail below.

### B. THE PARTIES

Plaintiffs Feeney Brothers Excavation Trust ("Feeney Trust") and AM Feeney Corp are the entities through which the Feeneys sold their FUSH equity in the EPA.[8] They are parties to the EPA, and Feeney Trust is party to the Rollover Agreement.[9]

Plaintiffs Falmouth 2011 Irrevocable Trust and Dennis 2011 Irrevocable Trust are parties to the Rollover Agreement.[10] They became holders of equity in one of defendants as a result of the EPA and Rollover Agreement.[11]

---

[6] *See* Compl. ¶¶ 1, 31, 65-68, 70; *see also* EPA §§ 1.02, 1.04.

[7] *See* Compl. ¶¶ 31, 68; EPA § 1.04; Compl. Ex. B (hereinafter "Rollover Agreement") at 1.

[8] *See* Compl. ¶¶ 7-8; EPA at 1.

[9] *See* EPA at 1; Rollover Agreement at 1.

[10] *See* Rollover Agreement at 1.

[11] *See* Compl. ¶¶ 9-10.

Defendant Artera Services, LLC ("Artera Services") holds a portfolio of businesses providing infrastructure services primarily to the natural gas and electric industries.[12]  It is party to the EPA as the "Buyer" of FUSH equity.[13]

Defendant Artera Services Holdco, LLC ("Artera") is the ultimate parent of Artera Services.[14]  Artera is party to the Rollover Agreement, and its equity was exchanged as part of the rollover.[15]

Defendant Artera Services Management Feeder, LLC ("Feeder" and, with Artera Services and Artera, the "Artera Defendants") is party to the Rollover Agreement.[16]  It was involved in the purchase and sale of Artera and FUSH stock pursuant to the EPA and Rollover Agreement.[17]

Defendant Clayton Dubilier & Rice, LLC ("CD&R") is a private equity firm and investor in Artera.[18]  CD&R was actively involved in the bidding process leading up to the EPA and Rollover Agreement.[19]

---

[12] *See* Compl. ¶ 12.

[13] *See* EPA at 1.

[14] *See* Compl. ¶ 31; *see also* EPA § 1.04.

[15] *See* Compl. ¶¶ 1, 68; Rollover Agreement at 1-3, § 1.1.

[16] *See* Rollover Agreement at 1.

[17] *See* Compl. ¶ 13.

[18] *See id.* ¶ 14.

[19] *See id.* ¶ 28.

## C.   ARTERA BIDS ON FUSH, AND THE FEENEYS AGREE TO SELL.

Beginning in late 2020, the Feeneys solicited bids from prospective buyers of FUSH.[20]   Of the final two bids the Feeneys considered, one was from Artera.[21] Whereas the other potential purchaser offered a complete cash buyout, Artera offered a deal that included part cash and part Artera rollover equity.[22]

To convince the Feeneys to take the Artera deal, the complaint alleges, defendants made representations about the value of the rollover equity.[23]   In or around April 2021, Artera Services' CEO and Chief Human Resources Officer, Brian Palmer and Michelle Dean, made a presentation to the Feeneys orally and via a slideshow.[24]  In that presentation, Palmer and Dean represented that: (i) "based upon the work of an independent third-party valuation consultant, performed on a quarterly basis," "the current valuation of Artera stock was $160 per share;"[25] (ii) "within a couple of years, Artera would undergo an initial public offering ('IPO'),'' and the Feeneys "could expect to have the value of the Artera shares double or triple

---

[20] *Id.* ¶ 26.

[21] *Id.* ¶ 27.

[22] *Id.* ¶¶ 30-31.

[23] Compl. ¶¶ 32-33.

[24] *Id.* ¶¶ 34-35.

[25] *Id.* ¶¶ 36, 39; *see also* D.I. 24 (hereinafter "Ans. Br.") at 28 (listing alleged false statements).

6

in value around such time;"[26] (iii) "the estimates for the company were that it would have $430 million in 2021 earnings before interest, taxes, depreciation, and amortization ('EBITDA');"[27] and (iv) "Artera would use financing to fund the contemplated acquisition."[28]

Plaintiffs allege these statements were false for various reasons. First, regarding the valuation and expected 2021 EBITDA, Palmer and Dean knew that an executive order issued in January 2021 would have an "extremely negative effect . . . on multiple Artera portfolio companies."[29] According to the complaint, that executive order "halted all oil and natural gas leases on public lands," on which Artera depended.[30] Second, "one of Artera's portfolio companies, Volt Power, had an on-the-job fatality in 2019, which exposed the company to heightened regulatory risk."[31] Third, "[d]efendants did not engage an independent third-party valuation consultant on a quarterly basis who provided a $160 Artera stock price."[32] Fourth, "Artera was not planning to undergo an IPO within two years, given market

---

[26] *Id.* ¶ 41.

[27] *Id.* ¶ 44.

[28] *Id.* ¶ 50.

[29] *See* Compl. ¶ 46.

[30] *See id.* ¶ 47.

[31] *See id.* ¶ 54.

[32] *See id.* ¶ 79.

conditions and other impediments."[33]  Last, the disclosure that Artera would use financing to complete the acquisition was a "half-truth," because after the acquisition, Artera's "debt-to-income ratio would exceed 10:1 . . . which was inconsistent with a $160 per share Artera stock value."[34]

The following month, plaintiffs allege, a CD&R Partner met with the Feeneys and "repeated many of the misrepresentations made by Mr. Palmer and Ms. Dean."[35] The complaint alleges that the CD&R Partner, Andrew Campelli, knew the representations were false for the same reasons outlined above.[36]

According to the complaint, "[u]ltimately, based upon the misrepresentations, intentional omissions, and half-truths of Artera, [the Feeneys] elected to sell their equity in FUSH to Artera rather than to the other bidder, which had offered a higher sales price."[37]

### D.    THE EPA AND ROLLOVER AGREEMENT

In June 2021, the Feeneys signed the EPA.[38]  That agreement provides the calculation and procedures for setting the monetary consideration to be paid for the

---

[33] *Id.* ¶ 42.

[34] *Id.* ¶¶ 50-52.

[35] Compl. ¶¶ 55-56.

[36] *See id.* ¶¶ 57-58.

[37] *Id.* ¶ 62.

[38] S*ee id.* ¶ 63.

8

sellers' interests in FUSH.[39]  The "Closing Consideration" was to be calculated from a "Base Purchase Price" of $700 million.[40]  In lieu of receiving the full closing consideration in cash, the EPA provides, the Feeneys would receive part of it as rollover equity in Artera pursuant to the Rollover Agreement.[41]

The Rollover Agreement provides multiple steps through which membership interests in FUSH are exchanged for units of Artera equity.[42]  Those steps use several terms defined in the "Recitals" section:[43]

- "Contributed Units" references "a number of [membership interests in FUSH] with an aggregate value of $30,000,000."

- "Rollover Amount" references "an aggregate value of $30,000,000," used in the context of describing the value of the Contributed Units.

- "Exchange Units" references "187,500 fully vested Feeder Common Units (with an aggregate value equal to the Rollover Amount and with each Feeder Common Unit having a value of $160.00), as defined in, and having the rights, powers, preferences and obligations set forth in, the LLC Agreement[[44]])."[45]

---

[39] *See id.* ¶ 65; EPA § 1.02.

[40] *See* EPA § 1.02(a).

[41] *See* Compl. ¶ 67; EPA § 1.04.

[42] *See* Rollover Agreement § 1.1.

[43] *See id.* at 1-2.

[44] "LLC Agreement" is defined to mean the limited liability company agreement of Feeder. *See id.* at 2.

[45] Mismatched parentheses in original.

- "Artera Units" references "a number of fully vested Common Units (as defined in, and having the rights, powers, preferences and obligations set forth in, the Artera Agreement[46]) equal to the number of the Exchange Units with an aggregate value equal to the Rollover Amount and with each Artera Unit having a value of $160.00."

Rollover Agreement Section 1.1 sets forth the exchange steps as follows:

- First, "the Contributed Units are contributed, assigned, transferred, conveyed, and delivered by [Feeney Trust[47]] to Feeder."[48]

- Second, "immediately thereafter, the Contributed Units are contributed, assigned, transferred, conveyed, and delivered by Feeder to Artera."[49]

- Third, "Feeder issues to [Feeney Trust] the Exchange Units."[50]

- Fourth, "Artera issues to Feeder the Artera Units."[51]

- Last, "[Feeney Trust] will be deemed to have made a capital contribution to Artera in an amount equal to the Rollover Amount with respect to the Artera Units issued hereunder."[52]

---

[46] "Artera Agreement" is defined to mean the limited liability company agreement of Artera. *See id.*

[47] The Rollover Agreement here and in the bullets below uses the term "Investor," defined to mean Feeney Trust. *See id.* at 1.

[48] *Id.* § 1.1(a).

[49] Rollover Agreement § 1.1(a).

[50] *Id.* § 1.1(b).

[51] *Id.* § 1.1(c).

[52] *Id.* § 1.1(d).

Rollover Agreement Section 2 contains representations and warranties of Feeder and Artera. These include that "Feeder has all requisite power and authority to issue the Exchange Units and Artera has all requisite power and authority to issue the Artera Units."[53] They also include that "[t]he Exchange Units . . . . [and] [t]he Artera Units, when issued and delivered in accordance with the terms hereof, will be validly issued and free and clear of any Liens and other restrictions other than those created pursuant to this Agreement, the LLC Agreement, the Artera Agreement or otherwise in connection with the transactions contemplated hereby."[54]

Section 3 contains representations and warranties of Feeney Trust. These include a Section titled "Access to Information; Sophistication; Lack of Reliance,"[55] which defendants contend includes a disclaimer of reliance on extra-contractual statements and plaintiffs invoke for other purposes. That section, 3.10, is set forth fully below.[56]

### E.    FEENEY MANAGEMENT TEAM MEMBERS BUY MORE SHARES.

After the EPA and Rollover Agreement were signed, around September 2021, "members of the senior Feeney management team purchased shares of Artera

---

[53] *Id.* § 2.2; *see also* Compl. ¶ 75 (quoting part of this representation).

[54] Rollover Agreement § 2.4; *see also* Compl. ¶ 76 (quoting part of this representation).

[55] *See* Rollover Agreement § 3.10.

[56] *See infra* § IV.B.

common unit stock at $160 per share through the Artera management equity plan."[57] The complaint alleges that "Artera marketed this [equity purchase] program to the senior management teams similarly to the way that it was marketed to [the Feeneys]."[58] This included Artera "falsely assert[ing] that Artera stock was valued at $160 per share by an independent third-party valuation consultant on a quarterly basis."[59] This was false, the complaint alleges, for similar reasons as the prior representations, as well as because Volt Power had a "second on-the-job fatality of an employee," which was a further "negative market condition[]" undermining Artera's valuation and estimated 2021 EBITDA.[60]

>    **F.    A MAY 2024 PRESENTATION SHOWS ARTERA'S 2021 EBITDA, AND CD&R INVESTS IN ARTERA AT A LOWER PRICE.**

A few years later, the complaint alleges, defendants' representations about Artera were revealed to be false. According to the complaint, "[o]n information and belief," sometime following September 2023, "Artera and CD&R worked together to further leverage Artera in order to benefit other companies within CD&R's portfolio."[61]

---

[57] Compl. ¶ 96.

[58] *Id.* ¶ 87.

[59] *Id.* ¶¶ 89-90.

[60] *See id.* ¶¶ 90-95.

[61] *Id.* ¶¶ 107, 109.

"A May 2024 Artera slideshow presentation . . . reveal[ed] that the actual 2021 EBITDA was actually 27% lower [than $430 million], at only $312 million" and that EBITDA further dropped in 2022.[62] A slideshow presentation provided by Artera in May 2024 also indicated that Artera had refinanced its debt and "CD&R invested significant capital into Artera at $0.08 per share."[63]

During a May 2024 phone call, CD&R Partner Campelli "admitted that Artera had a third-party consultant value Artera's common stock and that consultant determined the appropriate value was at just $0.08 per share."[64] Campelli "represented that Artera's stock price had dropped because Artera was overleveraged, with a debt to EBITDA ratio of 11:1," although, according to the complaint, overleverage "did not explain a 99.95% drop of [Artera's] stock value . . . in a matter of less than three years."[65]

## G.   PROCEDURAL HISTORY

Plaintiffs filed this action in May 2025.[66] After defendants moved to dismiss, plaintiffs in September 2025 filed the operative Amended Verified Complaint.[67] The

---

[62] *Id.* ¶ 100.

[63] Compl. ¶ 115.   The complaint is not clear whether this was the same May 2024 presentation referenced in the prior sentence.

[64] *Id.* ¶¶ 110-11.

[65] *Id.* ¶¶ 112, 114.

[66] *See* D.I. 1.

[67] *See* D.I. 7; D.I. 17.

13

operative complaint contains three counts: Count I for breach of the EPA and Rollover Agreement;[68] Count II for breach of the implied covenant of good faith and fair dealing;[69] and Count III for fraud.[70]

Defendants filed another motion to dismiss and an opening brief,[71] plaintiffs responded with an answering brief,[72] and defendants filed a reply.[73] The Court heard oral argument on April 10, 2026.[74]

## III. STANDARD OF REVIEW

Upon a Rule 12(b)(6) motion, the Court: (i) accepts all well-pleaded factual allegations as true; (ii) credits vague allegations if they give the opposing party notice of the claim; (iii) draws all reasonable inferences in favor of the non-moving party; and (iv) denies dismissal if recovery on the claim is reasonably conceivable.[75]

---

[68] *See* Compl. ¶¶ 121-24.

[69] *See id.* ¶¶ 125-31.

[70] *See id.* ¶¶ 132-41.

[71] *See generally* D.I. 19; D.I. 22, Defs.' Br. in Support of Their Mot. to Dismiss the First Am. Compl. (hereinafter "Op. Br.").

[72] *See generally* Ans. Br.

[73] D.I. 27 (hereinafter "Reply").

[74] *See* D.I. 32.

[75] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldg., LLC*, 27 A.3d 531, 535 (Del. 2011) (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896 (Del. 2002)).

The Court does not, however, accept conclusory allegations unsupported by facts or draw unreasonable inferences in favor of the nonmovant.[76]

## IV.  ANALYSIS

Plaintiffs' theories of liability fit into two groups: first, those based on obligations imposed within (or implied within) a contract; second, those based on extra-contractual statements.  The Court addresses each group in turn, finding that none of plaintiffs' theories state a claim.

### A.  PLAINTIFFS' INTRA-CONTRACTUAL THEORIES EACH SEEK TO IMPOSE TERMS FOR WHICH PLAINTIFFS FAILED TO BARGAIN.

Plaintiffs' "intra-contractual" theories encompass their count for breach of contract, the part of their fraud count purportedly based on intra-contractual statements, and their count for breach of the implied covenant.  At bottom, via each theory, plaintiffs seek representations and warranties or a guaranty that they failed to obtain at the bargaining table.  Accordingly, each intra-contractual theory fails.

#### 1.  BREACH OF CONTRACT

In Count I, plaintiffs contend that "[t]he Artera Defendants breached the Rollover Agreement by failing to provide the consideration they agreed to exchange for payments otherwise owed to [plaintiffs], namely $30,000,000 worth of Artera

---

[76] *Windsor I, LLC v. CWCapital Asset Mgmt. LLC*, 238 A.3d 863, 871 (Del. 2020) (citing *Deuley v. DynCorp Int'l, Inc.*, 8 A.3d 1156, 1160 (Del. 2010)).

15

Units."[77] Plaintiffs do not dispute that, through the Rollover Agreement, the Artera Defendants provided them with 187,500 fully vested Feeder Common Units[78] or that fully vested Feeder Common Units are the type of units the Rollover Agreement states plaintiffs would receive.[79] Rather, plaintiffs claim breach on grounds that those 187,500 units did not each have an "actual value" of $160 (or $30 million collectively).[80] According to plaintiffs, the "consideration" in the Rollover Agreement was units with an "actual value" of $30 million, and by providing units worth less than that, the Artera Defendants failed to provide the promised consideration.[81]

Plaintiffs' theory of breach invokes the Rollover Agreement's recital definitions.[82] The term "Exchange Units" refers to "fully vested Feeder Common Units (with an aggregate value equal to the Rollover Amount [(defined to mean $30 million)] and with each Feeder Common Unit having a value of $160.00), as defined in, and having the rights, powers, preferences and obligations set forth in the LLC

---

[77] Ans. Br. at 10. While the complaint asserts breach of both the Rollover Agreement and EPA, plaintiffs' answering brief only argues a breach of the Rollover Agreement. *See id.* at 10-13.

[78] *See* Compl. ¶ 123 (alleging that there were "187,500 units provided").

[79] *See* Rollover Agreement § 1.1(b) (stating that "Feeder issues to [Feeney Trust] the Exchange Units," which refer to fully vested Feeder Common Units).

[80] *See* Compl. ¶ 123; Ans. Br. at 10.

[81] *See* Compl. ¶ 123; Ans. Br. at 10.

[82] *See* Ans. Br. at 10-13.

Agreement)."[83]  Rollover Agreement Section 1.1(b) states that "Feeder issues to [Feeney Trust] the Exchange Units."[84]  Under plaintiffs' theory, this imposes an obligation on Feeder to issue to Feeney Trust the "Exchange Units" with an actual "aggregate value equal to [$30 million]," or each "a value of $160.00."  Because the units Feeder issued did not have that "actual value," plaintiffs' theory goes, Feeder did not issue the "Exchange Units" and thus the Artera Defendants did not provide the "consideration" promised.[85]

---

[83] Rollover Agreement at 1 (mismatched parentheses in original).

[84] *See id.* § 1.1(b).

[85] *See* Ans. Br. at 10-13.  Plaintiffs are imprecise about which part of Section 1.1 the Artera Defendants breached.  Subsection (a) states that "the Contributed Units are contributed, assigned, transferred, conveyed, and delivered by [Feeney Trust] to Feeder" and that "the Contributed Units are contributed, assigned, transferred, conveyed, and delivered by Feeder to Artera."  Rollover Agreement § 1.1(a).  Plaintiffs focus their argument on the definition of "Contributed Units" and cite subsection (a).  *See* Ans. Br. at 10-11.  But the Artera Defendants could not have breached the first part of subsection (a), because it does not obligate the Artera Defendants to do anything.  If it imposes an obligation, it is on Feeney Trust to deliver the Contributed Units—units of FUSH—to Feeder.  It is difficult to understand how the Artera Defendants could have breached an obligation on grounds that *FUSH units that Feeney Trust delivered* did not have the "actual value" purportedly represented in the contract.  If that is a breach by anyone, it would appear to be by Feeney Trust.  The second part of subsection (a) does not impose an obligation to deliver anything to plaintiffs; it only provides that Feeder will contribute the Contributed Units "to Artera."  Subsection (c) similarly provides only that Artera issues Artera Units "to Feeder," again no obligation to deliver anything to plaintiffs.  Rollover Agreement § 1.1(c).  Subsection (d) provides that Feeney Trust "will be deemed to have made a capital contribution to Artera in an amount equal to the Rollover Amount with respect to the Artera Units issued hereunder."  *Id.* § 1.1(d).  Plaintiffs do not contend that Feeney Trust was not "deemed" to have made a capital contribution to Artera in the $30 million Rollover Amount; rather, they contend that the units they received did not have an "actual value" of $30 million.  *See* Compl. ¶ 123; Ans. Br. at 10.  Because only subsection (b), concerning issuance of "Exchange Units," plausibly imposes an obligation on a defendant to a plaintiff, the Court assumes, for the sake of discussion, that plaintiffs are claiming breach of that subsection,

17

Plaintiffs' theory fails because it seeks to impose obligations via the recitals. "Generally, recitals are not a necessary part of a contract and can only be used to explain some apparent doubt with respect to the intended meaning of the operative or granting part of the instrument."[86] Recitals may identify the meaning of terms via definitions or "provide background and . . . offer insight into the intent of the parties."[87] But a recital may "not establish a substantive obligation."[88] And "[i]f the recitals are inconsistent with the operative or granting part, the latter controls."[89]

Plaintiffs are correct that reference to the recitals is necessary to identify which units were transferred or issued in the rollover transaction.[90] In identifying the units, Section 1.1 uses terms defined in the recitals.[91] The recitals are also

and the Court references the "Exchange Units" definition. But even if plaintiffs could claim a breach of the other subsections, the same reasoning would apply to those subsections and the defined terms they use.

[86] *Urdan v. WR Cap. P'rs, LLC*, 2019 WL 3891720, at *13 (Del. Ch. Aug. 19, 2019) (quoting *New Castle Cty. v. Crescenzo*, 1985 WL 21130, at *3 (Del. Ch. Feb. 11, 1985)), *aff'd*, 244 A.3d 668 (Del. 2020).

[87] *Id.* at *15 (referencing recitals to confirm which shares party sold); *Hawkins v. Daniel*, 273 A.3d 792, 812-14 (Del. Ch. 2022) (considering recitals to identify shares referenced and for purposes of agreement but explaining that there was "nothing in the preamble or recitals standing alone that would suggest" the party relying upon them was correct), *aff'd*, 289 A.3d 631 (Del. 2023).

[88] *Glidepath Ltd. v. Beumer Corp.*, 2019 WL 855660, at *16 (Del. Ch. Feb. 21, 2019); *see also Llamas v. Titus*, 2019 WL 2505374, at *17 (Del. Ch. June 18, 2019) (explaining that recitals "do not have the force of contractual stipulations" (quoting *TA Operating LLC v. Comdata, Inc.*, 2017 WL 3981138, at *23 (Del. Ch. Sept. 11, 2017))).

[89] *Urdan*, 2019 WL 3891720, at *13 (quoting *New Castle Cty.*, 1985 WL 21130, at *3).

[90] *See* Ans. Br. at 11.

[91] *See* Rollover Agreement at 1-2, § 1.1.

18

necessary to understand the amount of the capital contribution Feeney Trust is "deemed to have made."[92] But plaintiffs seek to use the recitals for more. They attempt to transform the recital definitions into a guaranty or representation and warranty regarding the units' "actual value."[93]

That use of the recitals conflicts with the operative sections of the contract. In Section 3.10, Feeney Trust represented that "no representation or warranty, express or implied, whether written or oral, as to the financial condition, results of operations, prospects, properties, or business of Artera or as to the desirability or value of an investment in Artera has been made to the [Feeney Trust] by or on behalf of Artera, except for those representations and warranties expressly set forth in Section 2 of this Agreement."[94] In other words, Feeney Trust agreed that the only representations and warranties in the Rollover Agreement regarding the business or value of an investment in Artera are contained in Section 2. Feeney Trust cannot

---

[92] *See* Rollover Agreement at 1-2, § 1.1(d) (providing Feeney Trust "will be deemed to have made a capital contribution to Artera in an amount equal to the Rollover Amount with respect to the Artera Units issued hereunder").

[93] *See* Compl. ¶ 123 (alleging breach of contract "because the actual value of the Artera Feeder Common Units (common stock) was materially less than $160"); Ans. Br. at 10 (arguing Artera Defendants breached because "the actual value of each unit was less than $160 per unit").

[94] Rollover Agreement § 3.10.

now maintain that there were representations and warranties in the recitals or other parts of the agreement.[95]

Sophisticated parties selling a business know how to make representations and warranties.[96] The parties did so here, both in the EPA and Rollover Agreement.[97] The EPA contains extensive representations and warranties, including about the condition of the business being purchased.[98] The Rollover Agreement's representations and warranties are more limited and do not concern Artera's business performance or the actual value of Artera's equity.[99] The Court will not transform other parts of the Rollover Agreement into a general representation and warranty about Artera's business prospects or a guaranty of a specific value.

The cases plaintiffs cite do not support a different result. In *New Castle County v. Crescenzo*, reference to the recitals was necessary to identify the type of

---

[95] Plaintiffs also reference the signature block of the "form of Rollover Subscription Agreement" attached to the Rollover Agreement. *See* Ans. Br. at 11-12 (providing screenshot of Rollover Agreement Ex. A); Rollover Agreement at 1 (noting that "form of Rollover Subscription Agreement" is "attached hereto as Exhibit A").

[96] *See Pilot Air Freight, LLC v. Manna Freight Sys., Inc.*, 2020 WL 5588671, at *2 (Del. Ch. Sept. 18, 2020) (explaining that "bargained-for representations and warranties serve an important risk allocation function" in a "heavily negotiated contract that covered a large number of specific risks explicitly" (citation modified)).

[97] *See* EPA Arts. 3-6; Rollover Agreement §§ 2-3.

[98] *See, e.g.*, EPA §§ 5.05 (concerning accuracy of financial statements), 5.06 (concerning material debts and liabilities), 5.11 (concerning contracts), 5.22 (concerning material customers).

[99] *See* Rollover Agreement § 2.

sewer system permitted by an easement.[100]  In *Creel v. Ecolab, Inc.*, the Court looked to the recitals as additional support for its interpretation of the agreement's operative provisions.[101]  In neither case did the Court invoke the recitals to create obligations. Rather, it looked to the recitals only to the extent necessary to understand the operative provisions or as further support for the Court's interpretation of those provisions.  Here, reference to the recitals is necessary only to identify the units being transferred and the amount of the capital contribution Feeney Trust was deemed to have made, and plaintiffs' interpretation of them would contradict, rather than support, the operative provisions.

Plaintiffs resist dismissal by characterizing their claims as arising from a "fail[ure] to provide the agreed-upon consideration."[102]  That characterization does not reflect a reasonable interpretation of the contract.  The "consideration" was not units with an "actual value" of $30 million, as plaintiffs suggest.[103]  The contract does not use the term "actual value" or "intrinsic value."  Rather, the operative provisions suggest that "value" refers to the "deemed" value of the units for purposes

---

[100] *New Castle Cty.*, 1985 WL 21130, at *3.

[101] *See Creel v. Ecolab, Inc.*, 2018 WL 5778130, at *3-5 (Del. Ch. Oct. 31, 2018) (interpreting operative portions of agreement and related agreements and then explaining that, "[a]dditionally," the recitals included references that further supported that interpretation).

[102] *See* Ans. Br. at 13.

[103] *See id.* at 10 (asserting that the consideration was units with an "actual value" of $160 each or "$30,000,000 worth of" units).

of Feeney Trust's contribution. They provide that Feeney Trust "will be *deemed* to have made a capital contribution to Artera in an amount equal to the Rollover Amount," not that the units Feeney Trust contributed or received had an intrinsic value of $30 million.[104] Plaintiffs did not bargain to receive a certain dollar amount but to receive a specific number of units, which defendants provided.

This interpretation makes sense in the context of the parties' bargain.[105] As the complaint alleges, plaintiffs declined a higher all-cash offer for their FUSH equity, electing instead to accept a lower purchase price and equity in Artera.[106] If it turned out that the units plaintiffs received were intrinsically worth more than the deemed value, or their intrinsic value later increased, plaintiffs would participate in that upside. But plaintiffs now advance an interpretation in which they could suffer no downside that, at the time of contracting, the units they received were intrinsically worth less than the $30 million deemed value. Had plaintiffs desired to receive a guaranteed cash value, they could have accepted an offer for just that. They cannot

---

[104] *See* Rollover Agreement § 1.1(d) (emphasis added); *cf. GC Broadway, LLC v. AN SM 1925 Broadway Hldgs., LLC*, 2026 WL 539233, at *22 (Del. Ch. Feb. 26, 2026) (distinguishing between "'deemed' value" of contribution to LLC, which was "for calculating returns and ownership," on one hand, and an "actual cash position" or "representation of liquidity," on the other hand).

[105] *See Chi. Bridge & Iron Co. N.V. v. Westinghouse Elec. Co. LLC*, 166 A.3d 912, 926-27 (Del. 2017) (interpreting contract for sale of business "in full and situated in the commercial context between the parties").

[106] *See* Compl. ¶¶ 5, 30-31.

22

now refashion recital language to obtain a guaranty or representation that the equity they received was worth a specific dollar amount.

Accordingly, Count I is dismissed.

### 2. INTRA-CONTRACTUAL FRAUD

Plaintiffs contend, as one part of Count III, that defendants committed intra-contractual fraud.[107] According to plaintiffs, "[i]n the black-and-white terms of the Rollover Agreement, the Artera Defendants misrepresented the value of the consideration they agreed to provide" by representing that the equity plaintiffs would receive had "a value of $160 per unit."[108] This claim only underscores that plaintiffs are seeking to enforce representations and warranties for which they did not bargain.

As explained above, the Rollover Agreement is clear that its only representations and warranties are contained Section 2.[109] In their complaint, plaintiffs reference Sections 2.2 and 2.4, which concern Artera's "requisite power and authority" to issue units and whether units were "validly issued and free and clear of any Liens and other restrictions."[110] Neither of those sections apply. Similar to their breach of contract claim, plaintiffs' intra-contractual fraud claim is based on the assertion that defendants misrepresented that "they were providing $30,000,000

---

[107] *See* Compl. ¶ 135.

[108] *See* Ans. Br. at 19 (citations omitted).

[109] *See supra* p. 19 (quoting Rollover Agreement § 3.10).

[110] *See* Compl. ¶¶ 75-76 (quoting Rollover Agreement § 2.2, 2.4).

of value to [p]lainitffs."[111] But whether the units had a "value" of $30 million does not bear upon whether Artera had the "requisite power and authority" to issue them or whether they were "validly issued and free and clear of any Liens and other restrictions." Perhaps recognizing this obstacle, plaintiffs in briefing make only a passing reference to either of these representations.[112]

Instead, as with their breach of contract claim, plaintiffs appear to rely on the recitals and Section 1.1.[113] But those provisions do not make representations that could support a fraud claim. They define terms and set forth the mechanics of the rollover exchanges. And because Feeney Trust agreed that the only representations and warranties are contained in Section 2, it cannot transform other parts of the contract, or extra-contractual statements,[114] into representations and warranties for

---

[111] *See id.* ¶ 135.

[112] *See* Ans. Br. at 19 (seeming to cite Rollover Agreement § 2.4 and § 2 generally, without explaining how they apply). Plaintiffs also invoke the EPA and seem to cite other sections of the Rollover Agreement or one of its exhibits. *See id.* (first citing EPA §§ 1.01(b)(v), 1.04; and then citing "AC [(the complaint)], Ex. B. [(the Rollover Agreement)], at Exhibit A [(seemingly referring to the "form of Rollover Subscription Agreement" attached to the Rollover Agreement as Exhibit A)], §§ 1.04, 1(d), 2, 2.4, Exhibit A [(seemingly referring again to the "form of Rollover Subscription Agreement)]"). It is unclear how any of these provisions could constitute false representations or warranties.

[113] *See id.* (citing Compl. ¶¶ 71-72, which reference the recitals and Section 1.1).

[114] Plaintiffs suggest that Rollover Agreement Section 3.10 "incorporate[s]" extra-contractual statements into the contract such that those statements could support a claim for intra-contractual fraud. *See id.* at 20. The effect of Section 3.10 is further discussed below. Regardless of whether it sufficiently disclaims extra-contractual fraud claims, that section does not transform extra-contractual statements into intra-contractual statements. Neither *Labyrinth, Inc. v. Urich*, nor any of plaintiffs' other authority on this point, holds otherwise. *See Labyrinth, Inc. v. Urich*, 2024 WL 295996, *17-19 (Del. Ch. Jan. 26, 2024)

an intra-contractual fraud claim.[115]  Thus, plaintiffs' intra-contractual fraud claim is dismissed.

### 3. IMPLIED COVENANT

In Count II, Plaintiffs contend the Artera Defendants breached the implied covenant of good faith and fair dealing.[116]  This claim fails as well.

The implied covenant is a "cautious enterprise" that involves "inferring contractual terms to handle developments or contractual gaps that the asserting party pleads neither party anticipated."[117]  A "limited and extraordinary remedy," the

---

(holding contract did not contain sufficient anti-reliance clause, not that purported anti-reliance clause incorporated extra-contractual statements into contract); *Matrix Parent, Inc. v. Audax Mgmt. Co., LLC*, 319 A.3d 909, 921-22 & n.97 (Del. Super. 2024) (addressing claims based only on written representations in four corners of contract); *Cygnus Opportunity Fund, LLC v. Washington Prime Grp., LLC*, 302 A.3d 430, 450-51 (Del. Ch. 2023) (addressing fiduciary duty of candor, not contractual representations); *In re Bracket Hldg. Corp. Litig.*, 2017 WL 3283169, at *10-11 (Del. Super. July 31, 2017) (assessing fraud claim based on statements "made outside of the written contract," not holding that they were intra-contractual statements).

[115] To be sure, for purposes of fraud, a party cannot disclaim reliance on knowingly false intra-contractual representations.  *See Abry P'rs V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1064 (Del. Ch. Feb. 14, 2006).  Here, however, the question is not whether defendants have disclaimed reliance on a contractual representation.  Rather, it is whether defendants made a contractual representation in the first place.  They did not, based on the Rollover Agreement's plain language, including Section 3.10.  *Cf. Roma Landmark Theaters, LLC v. Cohen Exhibition Co. LLC*, 2020 WL 5816759, at *16-17 (Del. Ch. Sept. 30, 2020) (declining to "abandon[] the parties' agreed-upon definition of the representations and warranties in the Purchase Agreement" where they specified that such representations and warranties were contained only in specific articles of agreement).

[116] *See* Compl. ¶¶ 125-31.

[117] *Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del. 2010) (quoting *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441 (Del. 2005)).

implied covenant will not be used to "rebalanc[e] economic interests after events that could have been anticipated, but were not"[118] or "as a backstop to imply terms that parties failed to include but which could easily have been drafted."[119] Rather, it will apply only when "the contract is 'truly silent' about the issue" and the "express terms . . . naturally imply certain corresponding conditions."[120] The implied covenant also applies "when a contract allocates discretionary authority to one party over a central aspect of the contract" and "the party exploits that discretion in a manner that defeats the 'overarching purpose' of the bargain."[121]

To state a claim, a plaintiff "must allege a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff."[122] The plaintiff bears the burden of proving the defendant "has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the [plaintiff] reasonably expected."[123]

---

[118] *Johnson & Johnson v. Fortis Advisors LLC*, 352 A.3d 229, 254-55 (Del. 2026) (quoting *Nemec*, 991 A.2d at 1125, 1128).

[119] *Baldwin v. New Wood Res. LLC*, 283 A.3d 1099, 1117 (Del. 2022) (citations omitted).

[120] *Id.* (quoting *Dieckman v. Regency GP LP*, 155 A.3d 358, 361 (Del. 2017)).

[121] *See Johnson & Johnson*, 352 A.3d at 253 (citations omitted).

[122] *Baldwin*, 283 A.3d at 1117-18 (quoting *Sheehan v. AssuredPartners, Inc.*, 2020 WL 2838575, at *11 (Del. Ch. May 29, 2020)).

[123] *Id.* at 1118 (quoting *Dieckman*, 155 A.3d at 367).

Plaintiffs base their implied covenant claim on two theories: (i) that the Artera Defendants "knowingly provid[ed] inaccurate and incomplete information to [plaintiffs] to induce the transaction;" and (ii) "after the execution of the EPA and Rollover Agreement, the Artera Defendants . . . undert[ook] actions to intentionally devalue Artera stock and undermine the EPA and Rollover Agreement consideration to an unreasonable degree."[124] Even taking the complaint's allegations as true and granting plaintiffs all reasonable inferences, neither theory succeeds.

As to the first theory, when parties have engaged in arm's-length negotiations, Delaware courts will not treat the implied covenant as a "free-floating duty" requiring the counterparty "to provide accurate and honest representations of [a company's] financial condition."[125] Rather, sophisticated parties allocate risks through representations and warranties.[126] They may not use the implied covenant after-the-fact to obtain representations they failed to secure at the bargaining table.[127]

---

[124] *See* Ans. Br. at 14.

[125] *See Pilot Air Freight*, 2020 WL 5588671, at *19 (quoting *Longerman v. EPE Hldgs., LLC*, 5 A.3d 1008, 1017 (Del. Ch. 2010)).

[126] *See Julius v. Accurus Aerospace Corp.*, 2019 WL 5681610, at *9 (Del. Ch. Oct. 31, 2019) (citation omitted), *aff'd*, 241 A.3d 220 (Del. 2020) (TABLE).

[127] *See, e.g.*, *Pilot Air Freight*, 2020 WL 5588671, at *19 (rejecting attempt to use "the implied covenant . . . to circumvent carefully negotiated representations and warranties"); *Osram Sylvania Inc. v. Townsend Ventures, LLC*, 2013 WL 6199554, at *18 (Del. Ch. Nov. 19, 2013) (dismissing implied covenant claim based on "failure to disclose" that sales results had fallen short of forecasts because "no representations or warranties regarding the forecasts were included" in the contract); *Airborne Health, Inc. v. Squid Soap, LP*, 984

That is what plaintiffs seek to do here. As explained above, plaintiffs obtained no representations or warranties about the value of Artera equity or aspects of the business with which they now take issue. That is so even though such representations could easily have been drafted and the relevant business risks were foreseeable.[128] For example, plaintiffs contend that Artera's business suffered because of an executive order and because it took on too much debt.[129] But prior to contracting, the executive order was public and defendants disclosed to plaintiffs that they would use debt to finance the transaction.[130] If plaintiffs wanted protection against these risks, they could have sought representations and warranties, but they may not now obtain that protection through the implied covenant.[131]

---

A.2d 126, 146 (Del. Ch. 2009) (rejecting attempt to use the implied covenant to obtain a "broader representation" than the one plaintiff negotiated).

[128] *See World Energy Ventures, LLC v. Northwind Gulf Coast LLC*, 2015 WL 6772638, at *12 (Del. Super. Nov. 2, 2015) ("[C]ourts should be most chary about implying a contractual protection when the contract could easily have been drafted to expressly provide for it." (citation omitted)); *Osram Sylvania*, 2013 WL 6199554, at *18 (rejecting implied covenant claim "because it was foreseeable to the parties at the time of contracting" that risk could manifest).

[129] *See id.* ¶¶ 46, 52.

[130] *See id.* ¶¶ 46, 50.

[131] As this Court recently explained, it would likely be too strict to require that a risk "could not be anticipated," in a literal sense. *See Facilities Hldgs., LLC v. ASM Glob. Parent*, --- A.3d ----, 2026 WL 1815842, at *9 (Del. Ch. June 24, 2026). That is because "[w]ith sufficient luck and creativity, virtually *any* future state of the world *could be* anticipated." *Id.* The issue for plaintiffs here is not that they failed to address some hyper-specific future state of the world. It is that they failed to obtain any contractual representations about Artera's business performance or the value of Artera's shares, as a general matter.

Plaintiffs cite several cases in support of their first theory, but none are on point. *Cygnus* concerned the duties of fiduciaries when making disclosures about a squeeze-out merger.[132]  It does not apply to an arm's-length transaction like the one at issue here.  *Aviation West Charters, LLC v. Freer* and *Kelly v. McKesson HBOC, Inc.* each concerned contracts that imposed specific obligations to accurately disclose financial information, and the Court applied the implied covenant to prevent selective disclosure when complying with those contractual provisions.[133]  By contrast, here, the Rollover Agreement contains no obligation for defendants to provide financial updates.  That includes Section 3.10, on which plaintiffs rely.[134]  That section states that Feeney Trust "has been granted the opportunity to ask questions of, and receive answers from, representatives of Artera" but does not require the disclosure of any specific financial information.[135]

---

[132] *See Cygnus*, 302 A.3d at 440, 459.

[133] *See Aviation W. Charters, LLC v. Freer*, 2015 WL 5138285, at *10 (Del. Super. July 2, 2015) (holding implied obligations arose out of specific sections stating that disclosed financial statements "were prepared in accordance with GAAP consistently applied and present fairly the financial position and results of operations of [the company] at the dates and for the periods indicated"); *Kelly v. McKesson HBOC, Inc.*, 2002 WL 88939, at *2-3, *10 (Del. Super. Jan. 17, 2002) (holding implied covenant "originates from Paragraphs 4.4 and 4.5 of the Merger Agreement," which represented that reports and financial statements company filed with the SEC did not "contain[] any untrue statement of a material fact or omit[] to state any material fact required to be stated," "were prepared in accordance with [GAAP] applied on a consistent basis," and "fairly present, in all material respects, the consolidated financial position of [the company]").

[134] *See* Ans. Br. at 17 (citing Rollover Agreement § 3.10).

[135] *See* Rollover Agreement § 3.10.

Plaintiffs also allude to defendants' "discretion."[136] But the disclosure of information in an arm's-length transaction is not a matter of one party's discretion. Rather, such parties can bargain for additional disclosures or representations and warranties, and, if they are not provided to a party's satisfaction, it can walk away from the deal.

Turning to plaintiffs' second theory, it is true that a party may breach the implied covenant by purposefully acting to damage a business to undermine the value of transaction consideration.[137] Here, however, plaintiffs do not allege facts to support that theory. Instead, plaintiffs plead only that defendants "intended to devalue the [Artera] shares by persistently overleveraging the business" and "undert[ook] intentional acts which wholly devalued the Artera stock."[138] The Court need not accept such conclusory allegations.[139] That is particularly so here, where plaintiffs' theory would require the Court to accept the unreasonable inference that

---

[136] *See* Ans. Br. at 16.

[137] *See, e.g.*, *Monica v. Delta Data Software, Inc.*, 2026 WL 370756, at *7-8 (Del. Super. Feb. 10, 2026) (holding plaintiff pled implied covenant claim where it alleged company purposefully acted to avoid receiving customer payments to undermine an earnout); *Light Years Ahead, Inc. v. Valve Acquisition, LLC*, 2021 WL 6068215, at *10 (Del. Super. Dec. 22, 2021) (holding plaintiff pled implied covenant claim where it alleged defendant "undertook purposeful acts that would damage the business").

[138] *See* Compl. ¶¶ 5, 130; *see also id.* ¶ 50 (alleging Artera had "intent to overleverage Artera to the point that the 'rollover' units would be almost entirely devalued").

[139] *See* *Windsor I, LLC*, 238 A.3d at 871 ("[W]e do not accept 'conclusory allegations unsupported by specific facts, nor do we draw unreasonable inferences in the plaintiff's favor.'" (quoting *Deuley*, 8 A.3d at 1160)).

30

Artera purposefully undermined its own business.[140]  The complaint gestures that

CD&R may have acted to harm Artera to "benefit other companies within CD&R's

portfolio," but plaintiffs do not assert Count II against CD&R,[141] and this allegation

is made only "[o]n information and belief."[142]  Absent supporting factual allegations,

the Court will not infer that the Artera Defendants acted against their own interest.

Plaintiffs have failed to plead a breach of the implied covenant.  Count II is

dismissed.

---

[140] *See Brehm v. Eisner*, 746 A.2d 244, 257-58 (Del. 2000) (affirming dismissal of claims based on "illogical and counterintuitive" allegations that defendant acted against his own financial self-interest); *Erisman v. Zaitsev*, 2021 WL 6134034, at *16 & n.159 (Del. Ch. Dec. 29, 2021) (rejecting claim that defendant engaged in intentional dilution because it "rests on the unreasonable inference that [defendant] would act against his own best interests").

[141] *See* Compl. ¶¶ 125-31 (bringing claim against only the Artera Defendants).

[142] *See Neurvana Med., LLC v. Balt USA, LLC*, 2020 WL 949917, at *23 (Del. Ch. Feb. 27, 2020) (holding that allegation need not be accepted where it "was made merely '[u]pon information and belief' and was unsupported by well-pleaded facts" (citing *Griffin Corp. Servs., LLC v. Jacobs*, 2005 WL 2000775, at *6 (Del. Ch. Aug. 11, 2005))).

### B. PLAINTIFFS DISCLAIMED RELIANCE ON EXTRA-CONTRACTUAL STATEMENTS.

In the remaining part of Count III,[143] plaintiffs assert a fraud claim based on statements outside of the Rollover Agreement or EPA.[144] This claim fails because plaintiffs disclaimed reliance on extra-contractual statements.

"Delaware courts will honor clauses in which sophisticated parties disclaim reliance on extra-contractual representations."[145] "To be effective, a contract 'must contain language that, when read together, can be said to add up to a clear anti-reliance clause by which the plaintiff has contractually promised that it did not rely upon statements outside the contract's four corners in deciding to sign the contract.'"[146] That is in contrast to a "[m]urky integration clause[], or standard

---

[143] Defendants' opening brief argued that each of their fraud-related arguments "independently warrants dismissal" of Count III. *See* Op. Br. at 15. Although Count III appears to encompass inducement of "members of the senior Feeney management team" to purchase additional equity via "Artera's equity purchase program," *see* Compl. ¶¶ 85, 96, 137, plaintiffs have not raised any independent basis to sustain the "equity purchase program" aspect of that count. Accordingly, the Court treats the "equity purchase program" aspect as rising and falling with the rest of Count III. *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived." (citations omitted)); *Ultragenyx Pharm., Inc. v. Catalent Md., Inc.*, 2025 WL 4667818, at *9 (Del. Super. Dec. 16, 2025) (holding plaintiff waived issue by failing to raise it in response to defendants' briefing).

[144] *See* Compl. ¶¶ 136-38.

[145] *Anvil Hldg. Corp. v. Iron Acquisition Co., Inc.*, 2013 WL 2249655, at *8 (Del. Ch. May 17, 2013).

[146] *Prairie Cap. III, L.P. v. Double E Hldg. Corp.*, 132 A.3d 35, 51 (Del. Ch. 2015) (quoting *Kronenberg v. Katz*, 872 A.2d 568, 593 (Del. Ch. 2004)).

integration clause[] without [an] explicit anti-reliance representation[]," which will not do.[147]

A "critical" feature of an effective anti-reliance clause is that it "must come from the point of view of the aggrieved party (or all parties to the contract)."[148] A statement by the seller that it is not "making any other . . . representation or warranty" is insufficient, because it is not a "clear promise *by the Buyer* that it was not relying on statements made to it outside of the [a]greement."[149]

Beyond that perspective-based requirement, "Delaware law does not require magic words."[150] As the Court explained in *Prairie Capital*, an effective disclaimer need not "say that the Buyer did not rely on any representations other than those set forth in the [written agreement]."[151] Instead, a disclaimer can be "framed positively," "represent[ing] affirmatively that the Buyer only relied on the representations and warranties in the [agreement]."[152] In other words, "[i]f a party

---

[147] *See id.* at 50 (quoting *Abry P'rs*, 891 A.2d at 1059).

[148] *See FdG Logistics LLC v. A&R Logistics Hldgs., Inc.*, 131 A.3d 842, 860 (Del. Ch. 2016) (explaining that "[t]he difference between a disclaimer from the point of view of a party accused of fraud and from the point of view of a counterparty who believes it has been defrauded . . . . is critical").

[149] *Anvil*, 2013 WL 2249655, at *8 (emphasis added). For purposes of this issue, the plaintiffs are the "buyer," and defendants the "seller," because the representations concern equity that plaintiffs received from defendants in the deal.

[150] *Prairie Cap.*, 132 A.3d at 51.

[151] *See id.*

[152] *Id.*

33

represents that it only relied on particular information, then that statement establishes

the universe of information on which that party relied."[153]

Here, the parties dispute whether Rollover Agreement Section 3.10 contains

an effective anti-reliance clause. That section provides, in full:

> 3.10. Access to Information; Sophistication; Lack of Reliance. The Exchange Units represent an indirect investment in Artera. The Investor is familiar with the business and financial condition, properties, operations, and prospects of Artera and the Investor has been granted the opportunity to ask questions of, and receive answers from, representatives of Artera concerning Artera and the terms and conditions of the acquisition of the Exchange Units and to obtain any additional information that the Investor deems necessary to verify the accuracy of the information so provided. The Investor's knowledge and experience in financial and business matters is such that the Investor is capable of evaluating the merits and risk of the Investor's investment in the Exchange Units. The Investor has carefully reviewed the terms and provisions of this Agreement, the LLC Agreement, the Artera Agreement and has evaluated the restrictions and obligations contained therein.
>
> In furtherance of the foregoing, the Investor represents and warrants that as of the Exchange Time, (a) no representation or warranty, express or implied, whether written or oral, as to the financial condition, results of operations, prospects, properties, or business of Artera or as to the desirability or value of an investment in Artera has been made to the Investor by or on behalf of Artera, except for those representations and warranties expressly set forth in Section 2 of this Agreement, (b) the Investor has relied upon the Investor's own independent appraisal and investigation and the advice of the Investor's own counsel, tax advisors, and

---

[153] *Id.*

other advisors regarding the risks of an investment in Artera, and (c) the Investor will continue to bear sole responsibility for making its own independent evaluation and monitoring of the risks of its investment in Artera.[154]

Section 3.10 effectively disclaims reliance. Specifically, it provides that

> the Investor represents and warrants that . . . no representation or warranty, express or implied, whether written or oral, as to the financial condition, results of operations, prospects, properties, or business of Artera or as to the desirability or value of an investment in Artera has been made to the Investor by or on behalf of Artera, except for those representations and warranties expressly set forth in Section 2 of this Agreement.[155]

This provision is from the perspective of Feeney Trust, as the "Investor."[156]

In it, Feeney Trust affirmatively "represents and warrants" that there are no representations and warranties by or on Artera's behalf, except for those in Rollover

---

[154] Rollover Agreement § 3.10 (paragraph break added for readability). The Rollover Agreement also contains an integration clause, which provides: "This Agreement, together with the [EPA], the LLC Agreement and the Artera Agreement, constitutes the entire agreement of the parties hereto with respect to the subject matter hereof, and supersedes any prior agreement or understanding among them with respect to such subject matter." *Id.* § 16.

[155] *Id.* § 3.10.

[156] Although this provision names Feeney Trust, and the other representations and warranties in Section 3 are on behalf of Feeney Trust, *see id.* §§ 3, 3.10 (referring to the "Investor"), plaintiffs do not argue that the anti-reliance clause does not preclude claims by other plaintiffs. *See* Ans. Br. at 22-26 (arguing that the Rollover Agreement "contains no anti-reliance provision" and that defendants "cannot contractually bar the Feeney Parties' [(defined to mean all plaintiffs')] claims to the extent that they are based upon intentional frauds or fraudulent concealment," without distinguishing between different plaintiffs). The text of the Rollover Agreement provides that Feeney Trust is the entity that was to receive units from defendants and was deemed to have made a capital contribution in Artera. *See* Rollover Agreement § 1.1(b), (d).

Agreement Section 2. It further specifies what other types of representations and warranties it is disclaiming: those regarding "the financial condition, results of operations, prospects, properties, or business of Artera or as to the desirability or value of an investment in Artera." Those are precisely the types of extra-contractual representations on which plaintiffs now seek to rely.[157]

To be sure, Section 3.10 does not use "magic words" of stating that plaintiffs "are not relying" or "disclaim reliance."[158] Instead, it identifies the "universe of contractually operative representations in [the] written agreement,"[159] specifically, those "expressly set forth in Section 2."[160] Having represented that no other representations exist, plaintiffs cannot now rely on such non-existent representations.

This is consistent with *Abry Partners*, in which the Court noted that a party may disclaim "reliance upon, or the existence of," extra-contractual statements.[161]

---

[157] *See* Ans. Br. at 28 (summarizing statements as concerning the "value" of Artera and its equity, as well as the anticipation of Artera "pursuing an IPO" and having "$430 million in 2021 EBITDA," which were allegedly false because they "were inconsistent with Artera's tenuous financial state" which defendants "ma[de] worse by intentionally overleveraging Artera" (citing Compl. ¶¶ 39-40, 41-54, 56-59)).

[158] *See Prairie Cap.*, 132 A.3d at 51 (finding anti-reliance clause effective even though "[i]t does not say that the Buyer did not rely on any representations other than those set forth in the [agreement]").

[159] *See id.* at 53.

[160] *See* Rollover Agreement § 3.10.

[161] *See Abry P'rs*, 891 A.2d at 1064 n.85.

The Court further treated as effective an anti-reliance clause that did not affirmatively say that the buyer was "not relying" or was "disclaiming reliance."[162] Instead, that provision stated that "Acquiror acknowledges and agrees that neither the Company nor the Selling Stockholder has made any representation or warranty, express or implied . . . except as expressly set forth in this Agreement."[163] The Court emphasized that the provision "operates to define what information the Buyer relied upon in deciding to execute the Agreement," and "[b]y its plain terms, the Buyer promised that neither the Company nor the Seller had made any representation or warranty as to the accuracy of any information about the Company except as set forth in the Agreement itself."[164]

This holding is likewise consistent with the rationale behind *Abry Partners'* rule. The Court there explained that courts must balance "traditional abhorrence of

---

[162] *See id.* at 1041 (setting forth the "critical provision").

[163] *See id.*

[164] *See id.* The anti-reliance clause in *Abry Partners* also provided that "Acquiror acknowledges and agrees that . . . neither the Company nor the Selling Stockholder shall have or be subject to any liability to Acquiror or any other Person resulting from the distribution to Acquiror, or Acquiror's use of or reliance on, any such information or any information, documents or material made available to Acquiror in any 'data rooms,' 'virtual data rooms,' management presentations or in any other form in expectation of, or in connection with, the transactions contemplated hereby." *Id.* The Court explained that with this language the Buyer "further promised" that neither the Seller nor the Company would be liable for reliance on extra-contractual information. It did not state that this further promise was required, beyond the promise that there had been no extra-contractual representations or warranties. *See id.*

37

fraud" with the public policy of promoting "freedom of contract."[165] In striking that balance, the Court pointed out that failure to enforce an anti-reliance clause did not "promote a public policy against lying."[166] To the contrary, such a failure would "excuse a lie made by one contracting party in writing—the lie that it was relying only on contractual representations and that no other representations had been made—to enable it to prove that another party lied orally or in a writing outside of the contract's four corners."[167] Failure to enforce Section 3.10 would implicate this "double liar problem."[168] It would allow Feeney Trust, who "represent[ed] and warrant[ed]" that, outside of Section 2, representations *have not been made*, to assert that such outside representations *have been made*, and plaintiffs relied on them.

Seeking to avoid this interpretation, plaintiffs rely on *Labyrinth*.[169] There, the purported anti-reliance clause provided:

> Independent Investigation: Buyer has conducted its own independent investigation, review and analysis of the business, results of operations, prospects, condition (financial or otherwise) or assets of the Company, and acknowledges that it has been provided adequate access to the personnel, properties, assets, premises, books and records, and other documents and data of Seller and the Company for such purpose. Buyer acknowledges and

---

[165] *See id.* at 1058-59.

[166] *Id.* at 1058.

[167] *Id.*

[168] *See id.* at 1064 n.85.

[169] *See* Ans. Br. at 22-24 (citing *Labyrinth*, 2024 WL 295996, at *15-18).

agrees that in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, none of Seller, the Company or any other Person has made any representation or warranty as to Seller, the Company or this Agreement, except as expressly set forth in Sections 3 and 4 of this Agreement (including the related portions of the Disclosure Schedules).[170]

The Court held that this provision was insufficient to disclaim reliance.[171] In doing so, it emphasized the first clause, providing that "Buyer has conducted its own independent investigation, review and analysis of the business, results of operations, prospects, condition (financial or otherwise) or assets of the Company, and acknowledges that it has been provided adequate access to the personnel, properties, assets, premises, books and records, and other documents and data of Seller and the Company for such purpose."[172] Instead of disclaiming reliance, the Court explained, this clause "reasonably can be read to reflect that Buyer was expressly representing it *did rely* on extra-contractual information."[173] The Court noted that the clause affirmed that Buyer "conducted its own independent investigation" and acknowledged it "has been provided adequate access" to the Company in deciding to enter the agreement.[174] This indicated, the Court explained, that "Buyer formed

---

[170] *Labyrinth*, 2024 WL 295996, at *16.

[171] *See id.* at *17-18.

[172] *See id.* at *16-17.

[173] *Id.* at *17 (quoting *Anschutz Corp. v. Brown Robin Cap., LLC*, 2020 WL 3096744, at *14 (Del. Ch. June 11, 2020)).

[174] *See id.*

39

a judgement or opinion of 'the business, results of operations, prospects, condition (financial or otherwise), or assets of the Company' from what Seller provided, namely 'the personnel, properties, assets, premises, books and records, and other documents and data of Seller and the Company for such purpose.'"[175]

Although they bear similarities, the provision in *Labyrinth* and Section 3.10 here are distinguishable. In particular, the *Labyrinth* provision stated the buyer "*has conducted*" an investigation and review of "the business, results of operations, prospects, condition (financial or otherwise) or assets of the Company" and, "*for such purpose*," "has been provided adequate access to the personnel, properties, assets, premises, books and records, and other documents and data of Seller and the Company."[176] This indicated that the buyer did in fact rely on those materials from the seller and company for its independent investigation.

By contrast, while it states that Feeney Trust was "familiar with the business and financial condition, properties, operations, and prospects of Artera," Section 3.10 does not indicate that Feeney Trust in fact relied upon extra-contractual statements. It provides that Feeney Trust "*has been granted the opportunity* to ask questions of, and receive answers from, representatives of Artera . . . and to obtain any additional information that [Feeney Trust] deems necessary to verify the

---

[175] *See id.*

[176] *See id.* at \*16 (emphasis added).

accuracy of the information so provided."[177]   Stating that a buyer has had "the

opportunity" to ask questions does not indicate that the buyer has in fact done so and

relied upon the answers or other information provided in response.  Later, Section

3.10 states that Feeney Trust "has relied on [Feeney Trust's] own independent

appraisal and investigation . . . regarding the risks of an investment in Artera."[178]

But that does not represent that Feeney Trust relied on extra-contractual

representations either.  It represents only that Feeney Trust relied on its "own

independent appraisal and investigation," without specifying the content of that

investigation.  Again, Feeney Trust represented that it had "the opportunity" to ask

questions, but not that it actually did so.[179]

Plaintiffs contend that this case is like *Labyrinth* because the "first section [of

Section 3.10] establish[es] that [d]efendants provided information upon which

[plaintiffs] relied."[180]  That argument fails when comparing the language of Section

3.10 to the allegations of the complaint.  The "first section" to which plaintiffs point

---

[177] Rollover Agreement § 3.10 (emphasis added).

[178] *Id.*

[179] Moreover, if a statement that the buyer is relying on its own "independent investigation" of the company could render a reliance disclaimer ineffective, then the disclaimer in *Prairie Capital* would have been ineffective.  The provision at issue there included a statement that "Buyer acknowledges that it has conducted to its satisfaction an independent investigation of the financial condition, operations, assets, liabilities and properties of the [companies]." *See Prairie Cap.*, 132 A.3d at 50.  Yet the Court held that the provision contained an effective anti-reliance clause. *See id.* at 50-51.

[180] *See* Ans. Br. at 23 (emphasis omitted).

references "the opportunity to ask questions of, and receive answers from, representatives of Artera" and "to obtain any additional information [Feeney Trust] deems necessary to verify the accuracy of the information so provided."[181] This first section establishes, at most, that plaintiffs relied on "answers" or "additional information" they received in response to their "questions"—to the extent they took the "opportunity" to ask any.[182] But the complaint does not plead plaintiffs asked any questions about Artera's business before closing.[183] Plaintiffs thus fail to plead any "answers" or responsive "additional information" upon which they relied. This stands in contrast to *Labyrinth*, in which the buyer pleaded its "efforts to verify Seller's . . . representations," including asking specific questions, "which Seller obstructed."[184] Unlike the provision in *Labyrinth*, Section 3.10 does not establish reliance on any of the extra-contractual statements that plaintiffs now invoke; it disclaims reliance.

Plaintiffs next assert that, "as a matter of public policy," parties cannot preclude reliance for purposes of "intentional fraud."[185] That assertion

---

[181] *See* Rollover Agreement § 3.10.

[182] *See id.*

[183] *See, e.g.*, Compl. ¶¶ 34-54 (alleging defendants made "a presentation" in which they "concealed" and "chose not to disclose" facts, but not that plaintiffs asked any questions).

[184] *See Labyrinth*, 2024 WL 295996, at *19 & n.217 (quoting allegations of specific questions from buyer).

[185] *See* Ans. Br. at 25.

misapprehends Delaware law. Disclaimers of reliance on extra-contractual representations are enforceable even where a plaintiff alleges the fraud was "intentional."[186] As our Supreme Court has explained, when it comes to public policy, *Abry Partners'* key distinction is between (a) fraud claims "based on representations made *outside* of a merger agreement—which *can* be disclaimed through non-reliance language," and (b) fraud claims "based on 'false representation[s] of fact made *within* the contract itself'—which cannot be disclaimed."[187] Here, because the challenged representations were made outside of the contract, the anti-reliance clause is enforceable, regardless of whether plaintiffs allege the fraud was "intentional."

Similarly, plaintiffs argue that parties cannot disclaim reliance for "claims predicated on fraudulent concealment."[188] Even assuming such claims are treated differently,[189] this argument fails because plaintiffs do not adequately plead

---

[186] *See, e.g.*, *RAA Mgmt., LLC v. Savage Sports Hldgs., Inc.*, 45 A.3d 107, 112-13, 116-19 (Del. 2012) (enforcing anti-reliance clause where plaintiff claimed misrepresentations were "intentional," and affirming ruling in which trial court explained that anti-reliance clause "even absolves the seller from intentional fraud"). The Supreme Court in *RAA Management* "assume[d] that New York law applies, but conclude[d] that the outcome would be the same under Delaware law." *See id.* at 112, 118.

[187] *See id.* at 117 (quoting *Abry P'rs*, 891 A.2d at 1059); *see also Abry P'rs*, 891 A.2d at 1064 (providing only two exceptions to enforcement of anti-reliance clauses, both of which are based on "contractual" representations and warranties).

[188] *See* Ans. Br. at 25-26 (citing *Wind Point P'rs VII-A, L.P. v. Insight Equity A.P. X Co., LLC*, 2020 WL 5054791, at *16 (Del. Super. Aug. 17, 2020)).

[189] There appears to be disagreement on this point amongst Delaware courts. *Compare, e.g.*, *TransDigm Inc. v. Alcoa Glob. Fasteners, Inc.*, 2013 WL 2326881, at *8-9 (Del. Ch.

43

fraudulent concealment.[190] To plead fraudulent concealment, "the plaintiff must allege that the defendant took an affirmative action designed or intended to prevent the discovery of material facts and which does in fact prevent such discovery."[191] Plaintiff pleads no such affirmative act of concealment. As explained above, the complaint does not allege that plaintiffs asked any questions prior to closing, let alone that defendants concealed information in response.[192] Absent such allegations, "it is not reasonably conceivable that [defendants] did *anything* to prevent [plaintiffs] from discovering" the omitted information.[193]

May 29, 2013) (holding anti-reliance clause did not apply to claims based on "fraudulent and active concealment" because the clause did not state that seller was making no representation as to the "accuracy and completeness" of the information provided), *and Wind Point P'rs*, 2020 WL 5054791, at \*16-17 (following *TransDigm* "'exception' as to fraudulent concealment claims"), *with, e.g.*, *Prairie Cap.*, 132 A.3d at 51, 54 (declining to follow *TransDigm*, and rejecting argument that anti-reliance clause did not apply to "fraudulent omission and concealment claims," even though clause did not include language regarding "accuracy and completeness"), *and MidCap Funding X Tr. v. Graebel Cos., Inc.*, 2020 WL 2095899, at \*21 (Del. Ch. Apr. 30, 2020) (following *Prairie Capital* rather than *TransDigm*). Because plaintiffs fail to plead fraudulent concealment, the Court need not reconcile or choose between these cases here.

[190] *See Infomedia Grp, Inc. v. Orange Health Sols., Inc.*, 2020 WL 4384087, at \*9 (Del. Super. July 31, 2020) ("[E]ven if a fraudulent concealment claim theoretically could be alleged despite [the clauses disclaiming reliance], [plaintiff] does not adequately plead one here.").

[191] *Infomedia Grp.*, 2020 WL 4384087, at \*9 (first citing Restatement (Second) of Torts § 550 (Am. Law Inst. 1977); and then citing *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 150 (Del. Ch. 2004)).

[192] *See id.* at \*9 (dismissing fraudulent concealment claim, distinguishing from case in which "the seller concealed . . . information despite direct questions from the buyer relating to it" (citing *TransDigm*, 2013 WL 2326881, at \*2)).

[193] *See Pilot Air Freight*, 2020 WL 5588671, at \*2. Although the parties did not raise it, between briefing and oral argument, our Supreme Court in *Johnson & Johnson* affirmed a

If plaintiffs believed information about Artera's intrinsic value or business performance was important, they could have obtained contractual representations or asked questions about those matters. Because they did not, and the Rollover Agreement contains an anti-reliance clause, plaintiffs' extra-contractual fraud claim is dismissed.[194]

## V. CONCLUSION

The complaint does not state a claim under any intra- or extra-contractual theory. Defendants' motion to dismiss is granted.

/s/ *Patricia A. Winston*
**Patricia A. Winston, Judge**

---

post-trial finding of fraudulent concealment. *See* 352 A.3d at 269-71. There, defendant characterized a milestone payment as "'high[ly] certain' and an 'effective up front' payment," or, in other words, as "essentially guaranteed." *See id.* at 270. That assurance was an "affirmative act designed or intended to prevent . . . the discovery of facts giving rise to the fraud claim," because it "suggested that no regulatory issue threatened timely achievement of the milestone and gave [the counterparty] no reason to inquire further." *See id.* Here, by contrast, none of defendants' alleged statements could be reasonably interpreted as a guarantee or designed or intended to prevent discovery of facts giving rise to the fraud claim.

[194] Because plaintiffs' fraud claim is dismissed for the reasons explained in this Section IV.B and in Section IV.A.2 above, the Court need not address defendants' additional arguments for dismissal of Count III. *See* Op. Br. at 20-23, 25-27 (arguing fraud claim is based on inactionable forward-looking statements, based on omission of information defendants had no duty to disclose, and time-barred).